## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CAMERON ROBINSON,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:10-cv-459
Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Cameron Robinson brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application for supplemental security income (SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 9), the Commissioner's response in opposition (Doc. 10), and plaintiff's reply memorandum. (Doc. 11).

### PROCEDURAL BACKGROUND

Plaintiff was born in 1983. He has an eighth-grade education and no past relevant work experience. Plaintiff filed an SSI application in September 2006, alleging a disability onset date of April 2, 1988, due to a growth on the side of his head, a learning disability, depression/mood disorder, and speech and comprehension difficulties. (Tr. 77-79, 97). Plaintiff's application was denied initially and upon reconsideration. Plaintiff then requested and was granted a de novo hearing before an administrative law judge (ALJ). On April 29, 2009, plaintiff, who was represented by counsel, appeared and testified at a hearing before ALJ Amelia G. Lombardo. (Tr. 25-36). Robert Miller, plaintiff's step-father, briefly testified at the hearing (Tr. 30-31) as did a vocational expert (VE). (Tr. 36-39).

On September 22, 2009, the ALJ issued a decision denying plaintiff's SSI application. (Tr. 12-22).  The ALJ determined that plaintiff suffers from the severe impairments of borderline intellectual functioning, depression, and anxiety.  (Tr. 14).  The ALJ determined that such impairments do not alone or in combination meet or equal the requirements of any section of the Listing of Impairments.  (Tr. 15).  According to the ALJ, plaintiff retains the residual functional capacity (RFC) to perform a full range of work at all exertional levels but he has the following nonexertional limitations: He is limited to simple, unskilled, low stress jobs, defined for purposes of plaintiff's RFC as meaning no assembly line production quotas, and he is limited to minimal contact with the general public.  (Tr. 18).  Based on the VE's testimony, and using Grid Rule 204.00 as a framework for decision-making, the ALJ determined that there are jobs that exist in significant numbers in the national economy that plaintiff could perform given his age, education, work experience, and RFC.  (Tr. 22).  Accordingly, the ALJ concluded that plaintiff is not disabled under the Social Security Act and is therefore not entitled to SSI.  (Tr. 22).

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision.  The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing

*Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  In deciding whether the

Commissioner's findings are supported by substantial evidence, the Court must consider the

record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).

      To qualify for SSI, plaintiff must file an application and be an "eligible individual" as

defined in the Social Security Act.  42 U.S.C. § 1382(a); 20 C.F.R. § 416.202.  Eligibility is

dependent upon disability, income, and other financial resources.  20 C.F.R. § 416.202.  To

establish disability, plaintiff must demonstrate a medically determinable physical or mental

impairment that can be expected to last for a continuous period of not less than twelve months.

Plaintiff must also show that the impairment precludes him from performing the work he

previously performed or any other kind of substantial gainful employment that exists in the

national economy.  20 C.F.R. § 416.905.

      Regulations promulgated by the Commissioner establish a sequential evaluation process

for disability determinations.  20 C.F.R. § 416.920.  First, the Commissioner determines whether

the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability

is made and the inquiry ends.  Second, if the individual is not currently engaged in substantial

gainful activity, the Commissioner must determine whether the individual has a severe

impairment or combination of impairments; if not, then a finding of nondisability is made and the

inquiry ends.  An impairment can be considered as not severe only if the impairment is a "slight

abnormality" which has such a minimal effect on the individual that it would not be expected to

interfere with the individual's ability to work, irrespective of age, education, and work

experience.  *Farris v. Secretary of Health and Human Services,* 773 F.2d 85, 90 (6th Cir. 1985)

(citation omitted).  Third, if the individual has a severe impairment, the Commissioner must

compare it to those in the Listing, 20 C.F.R. Part 404, Subpart P, Appendix 1.  Plaintiff's

impairment need not precisely meet the criteria of the Listing in order for plaintiff to obtain

benefits.  It is sufficient if the impairment is medically equivalent to one in the Listing.  20

C.F.R. § 416.920(d).  If the impairment meets or equals any within the Listing, disability is

presumed and benefits are awarded.  *Id.*  Fourth, if the individual's impairments do not meet or

equal any in the Listing, the Commissioner must determine whether the impairments prevent the

performance of the individual's regular previous employment.  If the individual is unable to

perform the relevant past work, then a prima facie case of disability is established and the burden

of going forward with the evidence shifts to the Commissioner to show that there is work in the

national economy which the individual can perform.  *Lashley v. Secretary of H.H.S.*, 708 F.2d

1048, 1053 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 529 (6th Cir. 1981).

Plaintiff has the burden of proof at the first four steps of the sequential evaluation

process.  *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004).  Once

plaintiff establishes a prima facie case by showing an inability to perform the relevant previous

employment, the burden shifts to the Commissioner to show that plaintiff can perform other

substantial gainful employment and that such employment exists in the national economy.

*Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born v. Secretary of Health and Human

Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990).  To rebut a prima facie case, the Commissioner

must come forward with particularized proof of plaintiff's individual capacity to perform

alternate work considering plaintiff's age, education, and background, as well as the job

requirements.  *Wilson*, 378 F.3d at 548.  *See also Richardson v. Secretary of Health & Human

Services*, 735 F.2d962, 964 (6th Cir. 1984).  Alternatively, in certain instances the Commissioner

4

is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *Wilson*, 378 F.3d at 548.

A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). The sequential evaluation analyses outlined in 20 C.F.R. §§ 416.920 and 416.924 apply to the evaluation of mental impairments. However, the regulations provide a special procedure for evaluating the severity of a mental impairment at steps two and three. 20 C.F.R. § 416.920a. At step two, the ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." *Rabbers v. Commissioner Social Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009) (citing 20 C.F.R. § 404.1520a(b)(1)). If so, the ALJ "must then rate the degree of functional limitation resulting from the impairment." *Id.* (citing 20 C.F.R. § 404.1520a(c)(3)).

The claimant's level of functional limitation is rated in four functional areas, commonly known as the "B criteria": 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *Id.* (citing 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00 et seq.; *Craft v. Astrue,* 539 F.3d 668, 674 (7th Cir. 2008)). The degree of limitation in the first three functional areas is rated using the following five-point scale: None, mild, moderate, marked, and extreme. *Id.* (citing 20 C.F.R. § 404.1520a(c)(4)). The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: None, one or two, three, four or more. *Id.* If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled. *Id.* (citing § 404.1520a(d)(1)). Otherwise,

5

the impairment is considered severe and the ALJ will proceed to step three. *Id.* (citing §
404.1520a(d)(2)).

At step three of the sequential evaluation, the ALJ must determine whether the claimant's
impairment "meets or is equivalent in severity to a listed mental disorder." *Id.* A claimant
whose impairment meets the requirements of the Listing will be deemed conclusively disabled.
*Id.* If the ALJ determines that the claimant has a severe mental impairment that neither meets nor
medically equals a listed impairment, the ALJ will then assess the claimant's RFC before
completing steps four and five of the sequential evaluation process. *Id.* (citing 20 C.F.R. §
404.1520a(d)(3)).

It is well-established that the findings and opinions of treating physicians are entitled to
substantial weight. "In general, the opinions of treating physicians are accorded greater weight
than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*,
127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.
1985) ("The medical opinions and diagnoses of treating physicians are generally accorded
substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a
treating physician's opinion is entitled to substantially greater weight than the contrary opinion of
a non-examining medical advisor. *Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir. 1987). If a
treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's]
impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion
is entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2); *see also Blakley v. Commissioner*,
581 F.3d 399, 406 (6th Cir. 2009); *Wilson*, 378 F.3d at 544. "The treating physician doctrine is

6

based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

## EDUCATIONAL RECORDS

The record includes numerous evaluations prepared by teachers, counselors, school psychologists and others for purposes of assessing plaintiff's special education needs under the Individuals with Disabilities Education Act (IDEA). The first such evaluation in the record was conducted when plaintiff was in the second grade. A Multidisciplinary Conference Request form stated that plaintiff's "school performance-abilities are so far below grade level, it impairs his overall learning. Behavior is deteriorating due to this." (Tr. 203-04). The form also noted that plaintiff had repeated kindergarten and his needs could not be met in a regular second-grade classroom. (Tr. 203).

Psychologist Gordon Ford, M.A., administered three tests to plaintiff on February 19, 1991, when plaintiff was almost 8 years old. (Tr. 195-96). Plaintiff scored as follows on the Wechsler Intelligence Scale for Children (WISC) - Revised: Verbal IQ (VIQ) of 69-81;

7

Performance IQ (PIQ) of 64-80; and Full Scale IQ (FSIQ) of 67-77. (Tr. 195). Mr. Ford indicated that these results indicated plaintiff was operating within the mildly retarded to borderline defective classification verbally, nonverbally and globally. (*Id.*). The Bender Visual Motor Gestalt Test indicated that plaintiff was functioning at a mental age equivalency of approximately 5.5 to 5.75. (*Id.*). Mr. Ford reported that plaintiff's speech was somewhat difficult to understand because of minor articulation errors and a tendency towards mumbling and low-volume, although intelligibility improved as the listener became more acclimated to his mode of expression. (Tr. 196). Mr. Ford also reported that plaintiff became easily frustrated when tasks become too difficult and when he does not fully understand what he is to do. (*Id.*).

In December 1995, plaintiff was administered the Wechsler Individual Achievement Test (WIAT). Plaintiff was 12 years old and in the sixth grade at that time. Plaintiff achieved the following scores: Reading Composite - 62 (grade equivalent of 2.1); Spelling - 64 (grade equivalent of 2.1); and Math Composite - 74 (grade equivalent of 4.1). (Tr. 189).

Shortly after plaintiff was administered the WIAT, Kim Icenogle, M.A., the school psychologist, conducted a standard three-year reevaluation in order to determine plaintiff's continued eligibility for special education services as well as to plan for his educational needs. (Tr. 190). At that time, plaintiff was in a self-contained class for students with learning disabilities and was receiving speech and language services. Although Ms. Icenogle did not have the results of the recently administered WIAT, she reported that a review of the previous evaluation completed in 1991 portrayed an overall estimate of cognitive ability and academic skill levels within the borderline to mildly impaired range. (Tr. 190). Plaintiff's reading and spelling skills were estimated to be at a second-grade level while his math skills were estimated to be at a

8

fourth-grade level. Ms. Icenogle opined that based on plaintiff's overall demeanor, responses and test-taking behavior, he appeared to have trust issues and difficulty initiating and maintaining relationships in all areas. (Tr. 191). She noted that school staff had reported poor peer relationships and threatening behavior and she opined that his behavior and socialization skills could become more of a problem.

In the Social Development Study section of plaintiff's evaluation, social worker Nancy Bailey reported that his mother related he had fallen when he was three or four years old and she felt this contributed to his current problems. (Tr. 180). Ms. Bailey concluded that due to his academic performance and difficulties within the school environment, plaintiff appeared to be at risk. (Tr. 181).

On December 18, 1995, Karen Durrett, L.D. Res., administered the Detroit Tests of Learning Aptitude. (Tr. 193). Ms. Durrett indicated that plaintiff was very cooperative and she believed he tried to the best of his ability. She noted that during the reversed letters subtest, plaintiff stated the test was too difficult and had tears in his eyes. (*Id.*). She believed the test results were valid. (*Id.*). Ms. Durrett provided IQ scores of 76 verbal and 82 performance. (*Id.*).

A Multidisciplinary Conference Summary Report dated December 21, 1995, noted that plaintiff had very poor peer relations, was very defensive, and acted aggressively toward peers and adults. (Tr. 174-176). The report stated that plaintiff displayed difficulties in all academic areas, with math being a relative strength and reading being a particular weakness, and that emotional concerns were a contributing factor in plaintiff's classroom achievement. (Tr. 176). The report concluded there was a severe discrepancy between plaintiff's performance in all academic areas and his ability except as to math calculation. (Tr. 178).

9

An Individualized Education Plan (IEP) dated January 1997 noted that plaintiff had deficits in auditory processing, vocabulary development, visual motor coordination, reading comprehension and decoding, peer interaction and authority. (Tr. 160-61). It indicated plaintiff needed the structure provided by a program in which he attended special education classes more than 50% of the school day. (Tr. 165). A February 1997 Multidisciplinary Conference Summary Report noted that plaintiff had 38 disciplinary referrals that school year. (Tr. 171).

Evangeline A. Johnson, a school psychologist, evaluated plaintiff in August 1999 when plaintiff was 16 years old. (Tr. 206-209). IQ testing scores were as follows: VIQ of 76; PIQ of 91; and FSIQ of 82. (Tr. 206-09). Ms. Johnson noted a significant discrepancy between the verbal and performance scores but no processing deficit or relative strength or weaknesses. (Tr. 208). She stated that emotional indicators were present and that plaintiff's teachers reported learning was a problem, although his classroom behavior was viewed as adequate due to the highly structured setting. (*Id.*) She noted that plaintiff appeared to be "sluggish in his performance of tasks" and did not "seem to be motivated to learn." (Tr. 209).

### MEDICAL RECORDS

On September 26, 2006, when plaintiff was 23 years old, Catherine Staskavich, Ph.D., performed a mental functional capacity assessment at the request of the Butler County Department of Jobs and Family Services. (Tr. 210-13). Dr. Staskavich opined that plaintiff had a number of marked and extreme limitations in various work-related functions and that he was "unemployable." (Tr. 211). Plaintiff's responses were delayed and he appeared to struggle with comprehension of questions and at times recall of information. Plaintiff's mood was anxious and his affect was blunted. Plaintiff's insight and judgment were poor. On the Weschler Adult

10

Intelligence Scale - III (WAIS-III), plaintiff obtained a VIQ score of 66; PIQ score of 55; and FSIQ score of 58. Dr. Staskavich noted plaintiff's 1999 scores, which were significantly higher, but she opined that the description of his functional levels at that time indicated a level of impairment that was more consistent with his current test scores. She observed that plaintiff had difficulties with expressive language, understanding and following directions, beginning and remaining on task, and working up to his abilities.

Dr. Staskavich diagnosed mild mental retardation and anxiety disorder, NOS. She reported that plaintiff may appear to comprehend what he is asked but subsequently has considerable difficulty with task completion when perceptual organizational skills are required. Plaintiff's score on the comprehension subtest indicated impaired judgment. His current performance on cognitive testing and his limited adaptive functioning skills suggested he was functioning in the "MR" (mental retardation) range. Dr. Staskavich believed that plaintiff would have difficulty functioning in any employment setting unless it was a sheltered workshop. She reported that plaintiff's incarceration from ages 15-23[1] precluded him from having to function on his own and he was not able to manage finances, shop, and prepare his own food or manage living independently. Dr. Staskavich was of the opinion plaintiff would benefit from an MR group home setting with adequate supervision and support, as well as psychiatric consultation to evaluate psychotropic medications to assist him in coping with stressors.

Steven Sparks, Ph.D., a clinical psychologist, conducted a consultative examination of plaintiff on October 21, 2006. (Tr. 221-29). Plaintiff reported he had never been prescribed psychiatric medicine and had never been hospitalized for psychiatric issues. Plaintiff reported

---

[1]Plaintiff served eight years in prison and a two-year term of parole for a second-degree murder conviction.

11

depressive symptoms which were precipitated by his incarceration. Plaintiff stated he had no friends with whom he socialized and that he had fears when he was around people. Plaintiff stated that he was able to wash dishes and vacuum, but he had never learned to do laundry, cook or shop, and he did not know if he was able to handle money. He bathed approximately daily with some reminders. He had contact with his cousins daily. Mental status examination revealed that plaintiff's speech was slow and difficult to understand, and his statements suggested his thought process was impoverished but goal-directed. His mood was extremely subdued but not depressed. Plaintiff's responses were slow but relevant, and mentation appeared very concrete. Plaintiff's insight into the nature of his difficulties and his judgment were fair to poor. Dr. Sparks' overall clinical impression of plaintiff's cognitive functioning was that it was in the borderline range and adaptive functioning was likely the same. Dr. Sparks opined that plaintiff appeared capable of living independently if provided some assistance with skills he did not learn while in prison, such as cooking, laundry, and shopping.

On the WAIS-III, plaintiff obtained a VIQ score of 68; PIQ score of 62; and FSIQ score of 63. Dr. Sparks considered the results to be an invalid measure of plaintiff's current ability. He noted that plaintiff's mother had brought with her plaintiff's WASI test results from 1999 when he was in prison, and those scores were significantly higher scores of VIQ 76, PIQ 91, and FSIQ 82. Dr. Sparks observed that generally there is an extremely high correlation between Wechsler Abbreviated Scale of Intelligence (WASI) and WAIS-III scores and these scores remain stable over time. He attributed the significant drop in plaintiff's scores to a lack of effort on plaintiff's part and declared the current scores to be invalid. Dr. Sparks stated as follows:

> Mr. Robinson stated that he also completed the WAIS-III two weeks prior to the present evaluation as well for another evaluation, so a practice effect would have been expected to increase his scores. Rather, he scored significantly lower. Thus, it appears likely that Mr. Robinson did not put forth as great [an] effort during the current WAIS-III administration as he did previously, and results are not considered valid.

(Tr. 226).

Dr. Sparks opined that plaintiff was experiencing some social anxiety and depression related to adjusting to life outside prison. Dr. Sparks diagnosed adjustment disorder with depression and anxiety status post-imprisonment and assigned plaintiff a functional Global Assessment of Functioning (GAF) score of 71.[2] Dr. Sparks opined that plaintiff was only mildly impaired in his ability to relate to others, including fellow workers and supervisors, "due to learning to regulate his mood outside a prison setting" (Tr. 227); his ability to understand, remember and follow instructions is not impaired; his ability to withstand the stress and pressures associated with day to day work activity is not impaired; and he has the mental ability to manage his own funds since he has sufficient judgment, calculation and budgeting abilities necessary for appropriate financial management.

On October 31, 2006, state agency psychologist Leslie Rudy, Ph.D., reviewed the file and completed a mental RFC assessment. (Tr. 230-45). Dr. Rudy opined that plaintiff was

---

[2]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." Id. The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). Id. at 34. The DSM-IV categorizes individuals with scores of 41 to 50 as having "serious" symptoms. Id. Individuals with scores of 51-60 are classified as having "moderate" symptoms. Id. The next higher category, for scores of 61 to 70, refers to an individual with "some mild" symptoms who is "generally functioning pretty well." Id. A score of 71-80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors" and represent "no more than slight impairment in social, occupational, or school functioning." Id.

13

moderately limited in the following areas: his ability to understand and remember detailed instructions; his ability to carry out detailed instructions; his ability to maintain attention and concentration for extended periods of time; his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and the need for rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in work setting. Dr. Rudy determined that with respect to the "B" criteria of Listings 12.04 and 12.05, plaintiff has mild restrictions in his activities of daily living, mild difficulties in maintaining his social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration. Dr. Rudy concluded the "C" criteria were not present.

Dr. Rudy noted that the Ohio Department of Jobs and Family Services (ODJFS) had referred plaintiff for a consultative examination on September 26, 2006.[3] (Tr. 233). Dr. Rudy stated that the consultative examiner administered the WAIS-III on that date and again on October 21, 2006. Dr. Rudy found the scores to be an underestimation of plaintiff's ability. Dr. Rudy determined the ODJFS examiner did not provide a mental status examination that supported the marked to extreme limitations found in several areas. Dr. Rudy determined that the most accurate assessment of plaintiff's ability was that his cognitive and adaptive functioning are in the borderline range. Dr. Rudy concluded that plaintiff could understand and remember simple instructions but would likely have difficulty with more complex tasks given his limited intellectual functioning; he could relate adequately to others; and he could adapt to a job where the duties are routine and predictable. Dr. Rudy found plaintiff's statements to be credible in

---

[3]This was the exam by Dr. Staskavich.

nature but not in severity. A non-examining state agency psychologist, Dr. Karen Stailey-Steiger, Ph.D., affirmed Dr. Rudy's opinions in March 2007. (Tr. 250).

Plaintiff received treatment at Comprehensive Counseling Service (CCS) from August 2007 to March 2009. (Tr. 256-82, 309-23). He saw Judith Freeland, M.D., for his initial psychiatric evaluation. (Tr. 271-76). His chief complaints were that he was depressed and had a temper problem. He had trouble being around people, he had no friends, and he described himself as always having been "a loner." Dr. Freeland diagnosed major depression with psychotic features and indicated that borderline IQ should be ruled out. She assigned plaintiff a GAF score of 40[4] and prescribed medication.

Plaintiff was referred by CCS to Becky Brewer, MSW, PhD., LISW, a Post-Psychology Intern, for IQ testing in October and December 2007. (Tr. 252-55). Plaintiff reported he was hit in the head with a brick in prison when he was 16 years old, which he claimed resulted in impaired memory. He acknowledged avoiding people by staying home. He reported feeling jumpy and experiencing what sounded like panic attacks when he was around people at the mall or in stores. He had been prescribed Mirtazapine and Abilify by Dr. Freeland in August of 2007, neither of which were helpful. He had taken Seroquel for depression since October of 2007. Upon testing, he obtained a VIQ score of 52, a PIQ score of 51, and a FSIQ score of 49. Quantitative reasoning was the highest factored index score. Dr. Brewer reported that plaintiff's working memory was an area of relative weakness. Dr. Brewer diagnosed plaintiff with major depressive disorder, recurrent; post-traumatic stress disorder; and moderate mental retardation.

---

[4]The form Dr. Freeland completed states Axix [sic] V. - 40." Axis V is where a clinician reports a GAF score. DSM-IV, p. 32.

15

She also noted "Rule-Out Dementia Due to Head Trauma." (Tr. 255). Dr. Brewer assigned plaintiff a GAF score of 40. Dr. Brewer found it unclear whether some of his cognitive deficits are the result of a closed head injury at age 16, or from undisclosed head injuries due to fighting. (*Id.*). However, Dr. Brewer opined that a diagnosis of moderate mental retardation was warranted because there was some indication that plaintiff had academic and social difficulties before these injuries occurred as he had to repeat kindergarten because he "would not talk" and had been placed in special education classes for at least two grades. (*Id.*).

Treatment notes from CCS disclose that on March 3, 2008, C. Gibson, RN, reported plaintiff was "still feeling a little depressed" and "still stay[ed] home a lot" with increased anxiety when he was out in stores and crowds. (Tr. 265). However, he had been able to go out shopping over the weekend with family members. On March 17, 2008, Nurse Gibson reported that plaintiff went to a family birthday party at a pizza restaurant and was able to socialize for about an hour before his anxiety set in and he went to sit in the car by himself. Plaintiff reported he had his drivers license and hoped to make friends of his own over the summer. On April 14, 2008, Nurse Gibson noted that plaintiff reported he was doing well on an increased dose of Lexapro and was feeling more comfortable when going on outings with his family.

Plaintiff met with Nurse Gibson for a medical check and status update on August 14, 2008. (Tr. 260). Plaintiff had been off of his medications due to insurance issues and there was a noticeable difference in his presentation since the last visit. Plaintiff was given medication samples.

On August 14, 2008, Dr. Freeland completed a medical information form on behalf of the Butler County Department of Job and Family Services, wherein she reported that plaintiff was

16

unable to do classroom work or other work at that time due to a diagnosis of major depression with psychotic features. (Tr. 308). She gave an expected return to work/school date of August 14, 2009.

On August 20, 2008, Joel DeWitt, M.Div., LPC, plaintiff's counselor at CCS, completed a mental impairment questionnaire. (Tr. 279-82). Mr. DeWitt reported that he based his opinions on the diagnoses of major depressive disorder and mild mental retardation, but he acknowledged that plaintiff's depressive symptoms were managed with medication and noted that plaintiff "has become more volitional - playing basketball." (Tr. 279). The side effects from plaintiff's medications included slow movement and drowsiness, which were apparent during counseling sessions. Mr. DeWitt also reported that plaintiff demonstrated a need for assistance in completing forms and interpreting phraseology. He opined that plaintiff could become stable with continued compliance with his medications and with gradual exposure to goal-directed activities. Mr. DeWitt opined that plaintiff had marked restrictions of activities of daily living, marked limitation in maintaining social functioning, marked limitations in maintaining concentration, persistence or pace, and one or two episodes of decompensation within a 12-month period of at least two weeks duration. Mr. DeWitt opined that plaintiff had a current history of one or more years inability to function outside a highly supported living arrangement with an indication for a continued need for such arrangement. According to Mr. DeWitt, plaintiff would miss about four days of work per month as a result of his impairments or treatments.

In a progress note dated September 30, 2008, Mr. DeWitt reported that plaintiff was unable to answer how he would react in certain situations because he had never acted in those situations alone, stating he was always with a family member wherever he went out. (Tr. 256).

17

Plaintiff reported the only place he went alone was to doctors' appointments and counseling sessions. Plaintiff stated that he was functioning a little better than when he had first been released from prison because he could now go to stores and restaurants with family members.

Also on September 30, 2008, Mr. DeWitt completed a mental functional capacity form at the request of the Butler County Department of Job and Family Services. (Tr. 306-07). The notes reflect that plaintiff presented with slurred speech and slurred movement. He seldom left the house and when he did, he was always accompanied by a first-degree relative. Despite progress in socialization, plaintiff's baseline was to isolate or withdraw. Plaintiff seldom made decisions without insight from close family members. His medications included Lexapro and Seroquel. Mr. DeWitt opined that out of 20 work-related mental functions, plaintiff had no significant limitations in 11, moderate limitations in eight, and marked limitations only in his ability to understand and remember detailed instructions. Mr. DeWitt opined that plaintiff was unemployable.

Mr. DeWitt continued to counsel plaintiff from October through December 2008. (Tr. 314, 317-18, 321). In November 2008, plaintiff voted and indicated interest in obtaining some employment but expressed discouragement about being able to find a job due to his felony record. Plaintiff was provided information on vocational counseling. In December 2008, plaintiff had gone to a store and needed to leave as it became more crowded, but later in the month he attended a crowded basketball game and stayed the entire time.

Treatment notes from Nurse Gibson and Counselor DeWitt from January through March 2009 show that plaintiff continued to report progress and was getting out more. (Tr. 309-13).

18

## THE ALJ HEARING

Plaintiff testified at the ALJ hearing that he is able to read "a little bit." (Tr. 29). Although he was originally sentenced to 20 years in prison, he was released after eight years and served a two-year term of parole, which had terminated by the time of the ALJ hearing. (*Id.*). While in prison, he attended school and attempted to obtain a GED, but he did not pass the test. (Tr. 28). Plaintiff has lived with his grandfather since his release from prison. (Tr. 26-27). He has not had a job since being released. (Tr. 30-31). He has no physical impairments but takes antidepressant medications and attends counseling twice per month. (Tr. 32). Plaintiff is depressed but socially active with his family. (Tr. 32-33). Plaintiff had a computer in prison, but his testimony as to whether he knows how to use a computer was unclear. (Tr. 34-35). His mother lives nearby and she and his other relatives cook for him. (Tr. 34).

The ALJ's hypothetical question to the VE assumed an individual with no physical limitations who could perform a full range of heavy and medium work but who was limited to simple, unskilled, low stress work, with minimal contact with the general public and supervisors, and with no assembly line production quotas. (Tr. 36-38). The VE responded that there are approximately 25,000 jobs in the regional economy at the heavy level and 25,000 jobs at the medium level, which would include field worker, industrial cleaner, and warehouse worker, that the individual could perform. (Tr. 37-38). When cross-examined by plaintiff's counsel, the VE testified that missing approximately four days of work per month as a result of impairments or treatment would eliminate plaintiff's ability to sustain employment. (Tr. 39).

19

## OPINION

Plaintiff assigns four errors in this case.  First, plaintiff contends the ALJ erred by failing to evaluate the opinion of a non-treating medical source in accordance with the factors set forth in 20 C.F.R. § 404.1527(d)(2)-(6).  Second, plaintiff argues that the ALJ's reasons for rejecting the opinion of plaintiff's treating therapist, Mr. DeWitt, are not based on substantial evidence.  Third, plaintiff claims the ALJ erred by failing to find that his impairments meet the requirements of Section 12.05C of the Listing of Impairments for mental retardation.  Fourth, plaintiff claims the ALJ erred by relying on an improper hypothetical to the VE which was not supported by substantial evidence.

### First Assignment of Error

Plaintiff claims the ALJ erred by failing to evaluate the January 23, 2008 opinion of Dr. Brewer, a one-time examining psychologist, in accordance with the following factors:  the length, nature and extent of the treatment relationship; the frequency of examination; the medical specialty of the treating physician; supportability of the opinion; and consistency of the opinion with the record as a whole.  (Doc. 9 at 13, citing 20 C.F.R. § 404.1527(d)(2-6); *Wilson*, 378 F.3d at 544).  Plaintiff claims that the ALJ erred because he failed to address Dr. Brewer's GAF score of 40 while specifically noting the considerably higher GAF scores of 71 to 72 assigned by another consultative examining psychologist, Dr. Sparks.  (*Id.* at 13-14).  Plaintiff argues, without citing any supporting authority, that the ALJ was bound to explain why she considered the GAF scores assigned by one examining psychologist to be entitled to greater deference than the scores assigned by another examining psychologist.

20

The Commissioner responds that plaintiff's argument overlooks the fact that Dr. Brewer gave no opinion as to plaintiff's functionality or any limitations on work-related functions; the ALJ's decision shows that she considered Dr. Brewer's report; the ALJ explained why she believed the IQ scores Dr. Brewer reported were invalid; and the ALJ was not bound to consider the GAF score Dr. Brewer assigned to plaintiff. (Doc. 10 at 14-15).

Plaintiff has not shown that the ALJ erred by improperly evaluating Dr. Brewer's opinion. First, plaintiff's reliance on *Wilson,* 378 F.3d at 544, is misplaced. *Wilson* addresses the weight that must be given the opinion of a *treating source*. Dr. Brewer is not a treating source but instead is a one-time examining psychologist who saw plaintiff for the sole purpose of performing IQ testing. (Tr. 252). Thus, the ALJ did not err by failing to evaluate Dr. Brewer's opinion pursuant to the analysis set forth in *Wilson* for evaluating the opinion of a treating source.

Nor did the ALJ err by failing to accept Dr. Brewer's reported IQ scores. The ALJ acknowledged the low FSIQ score Dr. Brewer reported but noted that plaintiff's IQ scores seemed to "fluctuate and decline over time." (Tr. 16). It is the ALJ's duty to resolve conflicts in the evidence, *Kalmbach v. Commissioner of Social Sec.,* 409 F. App'x 852, 859 (6th Cir. 2011), and the Commissioner may reject IQ scores that are inconsistent with the record. *Baker v. Commissioner of Social Sec.*, 21 F. App'x 313, 315 (6th Cir. 2001) (citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1988)). Here, the ALJ fully explained why she rejected the scores reported by Dr. Brewer and accepted other reported IQ scores as a more accurate assessment of plaintiff's intellectual functioning. (Tr. 16-17). Those reasons are supported by substantial evidence of record as discussed below in connection with plaintiff's third assignment of error. The Court must therefore accept the ALJ's decision to reject Dr. Brewer's reported IQ scores. *See*

21

*Kalmbach*, 409 F. App'x at 859 (the Court must accept the ALJ's findings as to any fact if they are supported by substantial evidence).

Finally, the ALJ was not obligated to take into consideration the GAF score assigned by Dr. Brewer. *See Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (The ALJ's failure to reference the GAF scores in the RFC did not render the RFC inaccurate since the GAF score was not essential to the RFC's accuracy.). *See also Kornecky v. Commissioner of Social Security*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[the Court is] not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score. . . ."). For these reasons, plaintiff's first assignment of error should be overruled.

### Second Assignment of Error

Plaintiff alleges as his second assignment of error that the ALJ's reasons for rejecting the opinion of his treating therapist, Joel DeWitt, are not based on substantial evidence. (Doc. 9 at 14). Plaintiff claims that the ALJ violated SSR 06-03p by failing to consider the frequency of his counseling sessions with DeWitt, the length of the individual counseling sessions, and "the personal nature of the counseling environment," as well as DeWitt's educational and professional background as a Licensed Professional Counselor. (Doc. 11 at 3). Plaintiff claims the ALJ failed to address DeWitt's assessment that plaintiff had a current history of one or more years' inability to function outside a highly-supported living arrangement with an indication for a continued need for such an arrangement as documented by plaintiff's reliance upon the support of his family. (Tr. 279-82). Plaintiff also claims the ALJ erred by ignoring a narrative report of DeWitt which supports his conclusion that plaintiff would be unemployable for a period of 12 months or more, specifically information concerning plaintiff's "dependence upon his family in all areas of

22

functioning." (Doc. 11 at 3, citing Tr. 307). Plaintiff disputes the ALJ's finding that DeWitt's opinion was inconsistent with the degree of limitation DeWitt documented. (*Id.* at 3). Plaintiff alleges that the ALJ misconstrued DeWitt's treatment notes as showing plaintiff used a computer; the ALJ failed to acknowledge that plaintiff needed resources to assist him with filling out applications; and the ALJ misconstrued plaintiff's attempts to seek employment as an ability to engage in sustained employment.

The Commissioner claims that the ALJ accurately described DeWitt as a counselor who had treated plaintiff for a lengthy period of time[5]; the ALJ acknowledged the mental RFC assessment DeWitt had prepared on September 30, 2008, in which he opined that plaintiff was unemployable for a period of 12 months or more due to mental impairments (Doc. 10 at 16, citing Tr. 19); the ALJ addressed DeWitt's opinion that plaintiff was markedly limited with respect to the "B" criteria of Listing 12.05 and found the opinion was contradicted by other substantial evidence in the record, including DeWitt's own treatment notes (*Id.*); and although the ALJ did not explicitly address DeWitt's opinion that plaintiff had a current history of one or more years' inability to function outside a highly structured living arrangement and an indication of a continued need for such an arrangement, the ALJ's omission is not reversible error because the ALJ's analysis of the record as a whole applies equally to this opinion of DeWitt. (*Id.* at 16-17).

SSR 06-03p provides that the Commissioner will consider all available evidence in an individual's case record, including evidence from "acceptable medical sources" and "other sources." Only "acceptable medical sources" as defined under 20 C.F.R. § 404.1513(a) and §

---

[5]The Commissioner notes that the ALJ stated plaintiff had been treated at CCS since approximately 2006, when the actual date is August 2007 and the earliest treatment notes from DeWitt are dated September 2008. (Doc. 10 at 15-16, citing Tr. 14, 256-259, 271-276).

416.913(a) can provide evidence which establishes the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight. *Id.* "Acceptable medical sources" include licensed physicians and licensed or certified psychologists. *Id.* Licensed social workers, therapists, and educational personnel fall in the category of "other sources" who are not "acceptable medical sources." *Id.* Although information from such "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.* Factors to be considered in evaluating opinions from "other sources" who have seen the claimant in their professional capacities include how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairment. *Id.; see also Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Not every factor will apply in every case. SSR 06-03p. "Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions for these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.*

The ALJ sufficiently explained her reasons for rejecting DeWitt's opinions that plaintiff was unemployable for a period of 12 months or more due to mental impairments and that plaintiff

24

was "markedly limited" with respect to the "B" criteria[6] (Paragraph "D" criteria of Listing 12.05)[7]

so as to satisfy the requirements of SSR 06-03p. (Tr. 19, citing Tr. 281). The ALJ correctly

recognized that DeWitt is not an "acceptable treating source" because he is not a psychologist,

psychiatrist or physician. (Tr. 19). The ALJ decided to assign DeWitt's opinion no weight

because it was inconsistent with other substantial evidence in the record. The ALJ's decision

must be upheld because it is supported by substantial evidence. First, DeWitt's opinion that

plaintiff is unemployable due to his mental limitations is inconsistent with the mental functional

capacity assessment DeWitt had completed only one month later. On August 20, 2008, DeWitt

opined that plaintiff was "markedly limited" in all areas of social functioning. (Tr. 281).

However, in September 2008, Dewitt opined that plaintiff was "not significantly limited" in four

areas of social functioning and only "moderately limited" in one area. (Tr. 306). DeWitt failed to

assess marked limitations in any areas of social functioning at that time, finding that plaintiff is

"markedly limited" only with respect to his ability to understand, remember and follow detailed

instructions. (*Id.*).

Second, the ALJ determined that there was an inconsistency between DeWitt's opinion

that plaintiff met the "B" criteria and DeWitt's own treatment notes showing plaintiff was

interested in volunteer work and was actively investigating, and working towards, obtaining

gainful employment. (Tr. 19). While the ALJ incorrectly stated that plaintiff "work[ed] on a

---

[6]The "B" criteria are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and 4) episodes of decompensation. 20 C.F.R. pt. 404, Subpt. P, App 1, § 12.00 et seq.

[7]The ALJ erroneously cites Tr. 15F as the questionnaire on which DeWitt indicated plaintiff's limitations as to the "B" criteria (Tr. 19), but the questionnaire is actually Exh. 12F. (Tr. 279-282).

computer" (*Id.*), the ALJ could reasonably find based on DeWitt's notes describing plaintiff's job search efforts that plaintiff was not as markedly limited as DeWitt's August 2008 report reflects.

Third, the CCS progress notes document plaintiff's continued improvement and adjustment to life outside of prison. This documented improvement is consistent with the opinion of the consultative examining psychologist, Dr. Sparks. Dr. Sparks opined that plaintiff could live independently if taught the basic household skills he did not learn in prison. (Tr. 225). While other acceptable medical sources disagreed with Dr. Sparks' assessment, it is the ALJ's duty to resolve conflicts in the evidence. *See Kalmbach*, 409 F. App'x at 859. Because substantial evidence supports the ALJ's decision to reject DeWitt's opinion of total disability, the second assignment of error should be overruled.

### Third Assignment of Error

Plaintiff claims the ALJ erred by determining he does not meet Listing 12.05C for mental retardation. Listing 12.05 provides in pertinent part:

> Mental Retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

A claimant will meet Listing 12.05C for mental retardation "only '[i]f [his] impairment satisfies the diagnostic description in the introductory paragraph" and the criteria of subsection C. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 §

26

12.00(A)). Thus, for purposes of Listing 12.05C, plaintiff must show the following (1) "significantly subaverage general intellectual functioning," (2) "deficits in adaptive functioning," (3) such deficits initially manifested themselves during the developmental period (i.e., before age 22), and (4) a valid IQ score between 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function. *Id.* at 354-55. *See also Daniels v. Commissioner*, 70 F. App'x 868, 872 (6th Cir. 2003).

"Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. (DSM-IV) (2000), p. 42. "Adaptive functioning" includes the plaintiff's "effectiveness in areas such as social skills, communication, and daily living skills." *West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 698 (6th Cir. 2007) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993)). Mental retardation requires concurrent deficits or impairments in present adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. DSM-IV at 49.

In this case, the ALJ determined that plaintiff did not meet Listing 12.05C because he did not have valid IQ scores between 60 through 70. (Tr. 17). The ALJ noted that plaintiff's IQ scores appeared to "fluctuate and decline over time." (Tr. 16). The ALJ observed that recent reported scores had been low. (Tr. 17). Specifically, Dr. Brewer reported a FSIQ score of 49 in late 2007; Dr. Staskavich reported scores of FSIQ 58, PIQ 55 and VIQ 66 in October 2006; and Dr. Sparks reported scores of FSIQ 63, PIQ 62 and VIQ 68 two weeks later. (*Id*). However, the

27

ALJ noted that Dr. Sparks had declared the scores in the 60s invalid based on plaintiff's level of adaptive functioning and an inexplicable decrease in the scores over a short period of time. (*Id.*). The ALJ noted that in February 1991, plaintiff had attained a higher FSIQ score between 67 and 77, in December 1995 he achieved a VIQ score of 76 and PIQ score of 82, and in August 1999 he attained scores of FSIQ 82, VIQ 76 and PIQ 91. (*Id.*). The ALJ found the most valid indicator of plaintiff's actual IQ was the result of the August 1999 evaluation conducted for purposes of an IEP. (*Id.*, citing Tr. 206-209).

Plaintiff argues the ALJ did not adequately consider the evidence of record supporting a finding that he meets Listing 12.05C. (Doc. 9 at 20-21).

### The ALJ's Analysis of Plaintiff's Reported IQ scores

Plaintiff claims the ALJ erred in analyzing the validity of his current, lower IQ scores for two reasons. First, plaintiff contends that the ALJ erroneously relied on the opinion of Dr. Sparks. Plaintiff avers that Dr. Sparks inaccurately reported that plaintiff had attained a lower score on the WAIS-III which Dr. Sparks administered as part of his evaluation than on the WAIS-III which Dr. Staskavich had administered two weeks earlier. (Doc. 9 at 18-19, citing Tr. 20). However, the Court finds no support for plaintiff's position. Dr. Sparks declared the IQ test results from his evaluation invalid based in part on his opinion that plaintiff should have scored higher because he had taken the test just two weeks earlier, but in fact plaintiff's scores were significantly lower. (Tr. 226). Although Dr. Sparks' phrasing in his report is somewhat confusing, it is apparent that Dr. Sparks was comparing the results from his evaluation with the 1999 test results, not with the results of the test administered by Dr. Staskavich. Dr. Sparks noted that plaintiff's mother brought to the session his WASI scores from 1999 (FSIQ 82, PIQ 91 and VIQ 76), which Dr.

28

Sparks listed and which he found to be inconsistent with the present scores; Dr. Sparks noted that

plaintiff said he had taken the WAIS-III test two weeks earlier "so a practice effect would have

been expected to increase his scores;" and Dr. Sparks found that instead plaintiff had scored

significantly lower. (Tr. 226). However, Dr. Sparks' report did not list the scores from the test

administered two weeks earlier by Dr. Staskavich and there is no indication in his report that he

was ever given Dr. Staskavich's scores. Therefore, Dr. Sparks' only basis of comparison was

between the scores from his own evaluation and the 1999 scores. Accordingly, plaintiff has failed

to show that Dr. Sparks' assessment of plaintiff's IQ scores was invalid and that the ALJ erred by

relying on that assessment.

Second, plaintiff alleges that the ALJ inaccurately stated that Dr. Staskavich had

administered the Stanford-Binet test and reported extremely low IQ scores of 49-52, when in fact

it was Dr. Brewer who administered the Stanford-Binet test and reported those scores. (Doc. 9 at

19-20, citing Tr. 20). The ALJ did make this misstatement in her opinion. (Tr. 20). However,

the error is inconsequential because the ALJ had accurately reported and rejected both Dr. Brewer

and Dr. Staskavich's test results on identical grounds earlier in her opinion. (Tr. 17).

Plaintiff's IQ scores varied widely over the years, and it was the ALJ's duty to resolve the

conflicting evidence to determine which IQ scores most accurately reflected plaintiff's intellectual

functioning. *See Kalmbach*, 409 F. A'ppx at 859. There is no opinion from a treating psychiatrist

or treating psychologist in the record concerning the validity of the scores, and the ALJ therefore

properly examined the records of the consultative examining medical sources and the evidence

provided by the other sources in this case to make this determination. Substantial evidence

supports the ALJ's decision that plaintiff's earlier, considerably higher IQ scores are a more

reliable measure of plaintiff's intellectual ability than his more recent sub-70 scores. (Tr. 15). The ALJ acknowledged that while plaintiff was in the borderline intellectual range, there were indications in the record that plaintiff's difficulties in school were not entirely attributable to his intellectual deficits. (*Id*.). Specifically, the records showed that significant behavioral and emotional issues contributed to his lack of achievement. (*Id*.). Moreover, the records noted that there was a significant discrepancy between plaintiff's achievement and ability. (*Id*.). The ALJ further noted that the higher scores were obtained at a time when plaintiff was not attempting to obtain SSI benefits. (Tr. 17). The ALJ found that although there was some speculation plaintiff may have suffered a brain injury from a blow to his head after the higher scores were reported, there were no clinical findings to document an organic brain impairment that would explain a subsequent dramatic decrease in his IQ scores. (*Id*.). The ALJ's analysis of plaintiff's IQ scores is substantially supported by the record.

### The ALJ's Analysis of Plaintiff's Level of Adaptive Functioning

Substantial evidence likewise supports the ALJ's determination that the reported sub-70 IQ scores were inconsistent with plaintiff's level of adaptive functioning. (Tr. 17-18). The examining psychologists, Dr. Sparks and Dr. Staskavich, provided conflicting opinions regarding plaintiff's level of adaptive functioning. The ALJ weighed the evidence and found that the opinion of Dr. Sparks was more logical and persuasive than the opinion of Dr. Staskavich. (Tr. 20). The ALJ discounted Dr. Staskavich's opinion because Dr. Staskavich based her assessment on (1) the subjective allegations of plaintiff and his mother as to plaintiff's inability to function on his own, and (2) the IQ scores Dr. Staskavich reported, which the ALJ declined to credit for the reasons explained above. (Tr. 20). The ALJ explained that Dr. Staskavich had evaluated plaintiff

shortly after his release from prison and had failed to take into account the fact that plaintiff's incarceration had likely delayed the development of his independent living skills. (*Id.*). Conversely, the ALJ found that Dr. Sparks' report was supported by the CCS progress notes, which consistently reported plaintiff was doing well and documented his increasingly frequent outings with family members. (Tr. 20). The ALJ found Dr. Sparks' opinion that plaintiff appeared to be capable of living independently if taught the basic household skills he did not learn while in prison to be consistent with these progress notes. (*Id.*). The ALJ noted that Dr. Sparks had concluded that plaintiff's symptoms were not indicative of a severe mental illness, and the GAF scores assigned by Dr. Sparks suggested an individual who was experiencing some "transient and expectable reactions to psychosocial stressors." (Tr. 20).

The CCS progress notes and other record evidence cited by the ALJ support his decision to accept the report of Dr. Sparks over that of Dr. Staskavich. The ALJ cited evidence which shows that plaintiff maintains his self-care and hygiene and is well-groomed; he does some light housework and is capable of more but usually leaves the work to others; he indicated to DeWitt a desire to make friends his own age and get his own apartment; he reportedly had obtained a drivers license; plaintiff enjoyed frequent shopping expeditions with family members; and he was seeking meaningful employment. (Tr. 15-17). The evidence cited by the ALJ also supports his finding that plaintiff's sense of social isolation had responded well to therapy since his release from prison and that plaintiff would likely improve in this area as he adjusted to life outside of prison. (Tr. 15-16).

For these reasons, the ALJ's decision to accept plaintiff's 1999 IQ scores, which are above the 60-70 range and do not satisfy Listing 12.05C, is supported by substantial evidence.

Plaintiff's claim that the ALJ erred by failing to find that his impairments meet the requirements of Listing 12.05C should be overruled.

**Fourth Assignment of Error**

Plaintiff claims the ALJ erred by relying on a hypothetical to the VE which does not take into account the limitations imposed by his major depressive disorder, which causes him to experience extreme social isolation and dependence upon his family. (Doc. 9 at 21-23). Plaintiff specifically alleges that the hypothetical violated SSR 96-8p, which states that the RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a "regular and continuing basis," *i.e.*, "8 hours a day, for 5 days a week, or an equivalent work schedule." Plaintiff asserts that DeWitt indicated he would miss approximately four days of work per month as a result of his impairments or treatment, and therefore he would not be able to do work on a sustained basis. (Tr. 282). Plaintiff notes that when this limitation was added to the hypothetical posed to the VE at the ALJ hearing, the VE opined that plaintiff would not be able to engage in sustained employment. (Tr. 39).

To constitute substantial evidence so as to satisfy the Commissioner's burden, the hypothetical question posed to the VE must accurately reflect the claimant's mental and physical limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). Where the hypothetical question posed by the ALJ fails to accurately portray the plaintiff's limitations and RFC, the ALJ errs by relying on the VE's answer to the hypothetical. *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 789 (6th Cir. 2009).

For the reasons stated in connection with the second assignment of error, the ALJ reasonably determined not to credit DeWitt's opinion because she found it was inconsistent with

32

the other substantial evidence of record.  Plaintiff does not point to other substantial medical

evidence in the record which shows he is unable to engage in sustained employment because he

suffers from a major depressive disorder.  To the contrary, DeWitt's August 2008 notes state that

plaintiff's depressive symptoms are "currently managed [with] medication," plaintiff had become

"more volitional," and the prognosis is that plaintiff "can be stabilized [with] continued

medication compliance and gradual exposure to goal-directed activities." (Tr. 279).  Accordingly,

plaintiff's fourth assignment of error should be overruled.  The ALJ's finding of nondisability

should be upheld as supported by substantial evidence.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED**.

Date: 6/10/2011

Karen L. Litkovitz
United States Magistrate Judge

33

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CAMERON ROBINSON,                      Case No. 1:10-cv-459
     Plaintiff                        Dlott, J.
                                       Litkovitz, M.J.

    vs


COMMISSIONER OF
SOCIAL SECURITY,
     Defendant


## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to these proposed findings and recommendations within **FOURTEEN DAYS** after being served with this Report and Recommendation ("R&R"). That period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within **FOURTEEN DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).